August 23, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1059

IN RE BALLARD SHIPPING COMPANY, ETC.,

Plaintiff, Appellee,

v.

BEACH SHELLFISH, ET AL.,

Claimants, Appellants.

ERRATA SHEET

Block quote on page 5: line 3, change "tort-feasor" to
"tortfeasor". On line 5, add a comma between "other" and
"unknown".

Page 5, 3 lines below block quote: "MT Fadi B" should be MT

FADI B".

Page 8, lines 2 and 3 down: change cite to "See R.I. Gen.

Laws 46-12.3-2, 46-12.3-3."

Page 13, 5th line down: change cite to "State of Louisiana

ex rel. Guste v. M/V Testbank, 752 F.2d 1019, 1022 (5th Cir.

1985) (en banc), cert. denied, 477 U.S. 903 (1986)."

Page 16, second to last line of second paragraph: change
"Id." to "Id."

Page 18, footnote 5, 5th line up: change period after
"Fireman's Fund Ins. Co.." to a comma.

Page 20, footnote 20, second to last line: "Rule" should
not be underlined.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 94-1059

IN RE BALLARD SHIPPING COMPANY, ETC.,

Plaintiff, Appellee,

v.

BEACH SHELLFISH, ET AL.,

Claimants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Boudin, Circuit Judge.

Thomas M. Bond with whom David B. Kaplan and The Kaplan/Bond

Group were on brief for appellants.

John J. Finn with whom Thomas H. Walsh, Jr., Marianne Meacham and

Bingham, Dana & Gould were on brief for appellee.

August 18, 1994

BOUDIN, Circuit Judge. This appeal presents the

question whether federal maritime law preempts Rhode Island

legislation affording expanded state-law remedies for oil

pollution damage. In an able opinion, the district court

held that the remedies were preempted. Discerning the law in

this area is far from easy; one might tack a sailboat into a

fog bank with more confidence. Yet guided in part by an

important Supreme Court decision rendered after the district

court's decision, we are constrained to reverse in part and

to remand for further proceedings.

The basic facts of the case are not in dispute. On June

23, 1989, the M/V World Prodigy, an oil tanker owned by

Ballard Shipping Co., ran aground in Narragansett Bay, Rhode

Island, spilling over 300,000 gallons of heating oil into the

bay. The wreck occurred when the ship strayed from the

designated shipping channel and collided with a rock near

Brenton Reef, about a mile south of Newport at the mouth of

the bay. The oil slick prompted the State of Rhode Island to

close Narragansett Bay to all shellfishing activities for a

period of two weeks during and after cleanup operations.

State authorities charged the captain of the ship with

entering the bay without a local pilot on board in violation

of state law. Both the captain and Ballard also pleaded

guilty to criminal violations of the Federal Water Pollution

Control Act, see 33 U.S.C. 1319(c). The captain and owner

-2-

were fined a total of $30,500 and $500,000, respectively. In

addition, Ballard agreed to pay $3.9 million in compensation

for federal cleanup costs, $4.7 million for state cleanup

costs and damage to natural resources, $500,000 of which was

to be available to compensate individuals, and $550,000 to

settle claims for lost wages by local shellfishermen.

A number of claimants filed suit against Ballard in

Rhode Island. Ballard responded on December 22, 1989, by

bringing a petition in admiralty for limitation or

exoneration from liability. 46 U.S.C. 185. "[T]he court

of admiralty in [a limitation of liability] proceeding

acquires the right to marshal all claims, whether of strictly

admiralty origin or not, and to give effect to them by the

apportionment of the res and by judgment in personam against

the owner, so far as the court may decree." Just v. Chambers,

312 U.S. 383, 386 (1941). In the present case, several

claimants reasserted their claims in the admiralty action.

The claimants in the present appeal are a group of

shellfish dealers who allege severe economic losses arising

from the two-week hiatus in shellfishing activities, which

suspended their operations during the busiest time of the

shellfishing season. They alleged negligence under the

general maritime law and the common law of Rhode Island, as

well as a claim for economic losses pursuant to the Rhode

Island Environmental Injury Compensation Act, R.I. Gen. Laws

-3-

ch. 46-12.3 et seq. ("the Compensation Act").

On June 17, 1992, Ballard moved to dismiss the shellfish

dealers' claims on the basis of the Supreme Court's decision

in Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303

(1927), which held that compensation for economic losses

standing alone is unavailable in admiralty cases. The

district court granted the motion, holding that Robins

preempted the contrary provisions of the state's Compensation

Act, which expressly provides for recovery of purely economic

losses arising from an oil spill. In re Complaint of Ballard

Shipping Co., 810 F. Supp. 359 (D.R.I. 1993). The dealers

now appeal from that dismissal.

We first address the federal claims brought under the

general maritime law. The Constitution grants the federal

courts authority to hear "all Cases of admiralty and maritime

Jurisdiction." U.S. Const. Art. III, 2. The parties agree

that the dealers' federal claims fall within this group

because the spill occurred on navigable waters and arose out

of traditional maritime activity. See Executive Jet

Aviation, Inc. v. City of Cleveland, 409 U.S. 249 (1972).

Admiralty jurisdiction brings with it a body of federal

jurisprudence, largely uncodified, known as maritime law.

See East River S.S. Corp. v. Transamerica Delaval, 476 U.S.

858, 864 (1985).

The dealers assert that their businesses were injured

-4-

when the World Prodigy spill prevented local fishermen from

harvesting shellfish in Narragansett Bay and thereby

precluded the dealers from purchasing the shellfish and

reselling them to restaurants and other buyers. The dealers'

maritime-law claims are thus purely for economic losses,

unaccompanied by any physical injury to their property or

person. Those federal claims, as the district court held,

are squarely foreclosed by Robins Dry Dock & Repair Co. v.

Flint, 275 U.S. 303 (1927).

In Robins, the charterer of a vessel sued a repair

company that negligently damaged the vessel while it was in

dry dock, alleging that the resulting delay caused the

charterer to lose profits that it would have otherwise

derived from the use of the ship. Justice Holmes wrote for

the Court in holding that the suit could not be maintained:

[N]o authority need be cited to show that, as a
general rule, at least, a tort to the person or
property of one man does not make the tortfeasor
liable to another merely because the injured person
was under a contract with that other, unknown to
the doer of the wrong. . . . The law does not
spread its protection so far.

275 U.S. at 309.

Justice Holmes's pronouncement could have been read

merely as negating a claim of negligent interference with

contract. See Getty Refining and Marketing Co. v. MT FADI B,

766 F.2d 829, 831-32 (3d Cir. 1985). Instead, Robins has

generally been taken to establish the broader rule that

-5-

purely economic losses arising from a tort, but unaccompanied

by physical injury to anything in which the plaintiff has a

proprietary interest, are not compensable under federal

maritime law. See, e.g., State of Louisiana ex rel. Guste v.

M/V Testbank, 752 F.2d 1019, 1022 (5th Cir. 1985) (en banc),

cert. denied, 477 U.S. 903 (1986). Our circuit adopted this

broader reading in Barber Lines A/S v. M/V Donau Maru, 764

F.2d 50, 51-52 (1st Cir. 1985), and, in any event, the

secondary nature of the economic injury here--which is akin

to interference with contract--would likely bring this case

within even a narrow reading of Robins.

Several courts have recognized exceptions to Robins, but

none of the familiar examples apply in this case.1 The

district court so held, and the dealers do not challenge that

conclusion on appeal. Accordingly, we agree that plaintiffs'

federal claims for purely economic losses under the general

maritime law are barred. The appeal thus turns upon the

extent to which Robins bars the states from permitting a

different result under state law pursuant to the exercise of

the state's police powers.

Although the Judiciary Act of 1789 vested "exclusive

1The classic exceptions include claims brought by
fishermen as "favorites of admiralty," see Union Oil Co. v.

Oppen, 501 F.2d 558 (9th Cir. 1974), and claims for economic

losses that are intentionally caused, see Dick Meyers Towing

Service, Inc. v. United States, 577 F.2d 1023, 1025 (5th Cir.

1978), cert. denied, 440 U.S. 908 (1979).

-6-

original cognizance of all civil causes of admiralty and

maritime jurisdiction" in the federal courts, the act added a

provision "saving to suitors, in all cases, the right of a

common law remedy, where the common law is competent to give

it." 1 Stat. 76-77. The modern version of the statute saves

"all other remedies to which [suitors] are otherwise

entitled." 28 U.S.C. 1333. The upshot is that an injured

party may have claims arising from a single accident both

under federal maritime law and under state law, whether

legislation or common law. See G. Gilmore & C. Black, Jr.,

The Law of Admiralty 1-13, at 37 (2d ed. 1975). State

remedies under the savings to suitors clause may be pursued

in state court or, where there is a basis for federal

jurisdiction, in federal court.

Whether a state claim is litigated in a federal court or

a state forum, "the extent to which state law may be used to

remedy maritime injuries is constrained by a so-called

`reverse-Erie' doctrine which requires that the substantive

remedies afforded by the States conform to governing federal

maritime standards." Offshore Logistics, Inc. v. Tallentire,

477 U.S. 207, 223 (1986) (citations omitted). How far this

conformity requirement extends, and whether it preempts the

dealers' state-law claims, are the central issues in this

case.

On appeal, the dealers mainly stress their claims under

-7-

Rhode Island's Compensation Act. The Compensation Act

provides generally that owners or operators of seagoing

vessels may be held liable for harms arising from negligence

of the owner, operator or agents or from the violation of

Rhode Island pilotage and water pollution laws. See R.I. Gen.

Laws 46-12.3-2, 46-12.3-3. The statute also contains the

following specific provisions regarding economic loss:

(a) A person shall be entitled to recover for
economic loss . . . if the person can
demonstrate the loss of income or diminution
of profit to a person or business as a result
of damage to the natural resources of the
state of Rhode Island caused by the violation
of any provision [of the piloting or water
pollution laws] by the owner or operator . . .
of the seagoing vessel and/or caused by the
negligence of the owner or operator . . . of
the seagoing vessel.

(b) In any suit brought to recover economic loss
it shall not be necessary to prove that the
loss was sustained as a result of physical
injury to the person or damage to his or her
property, nor shall it be a defense to any
claim that the defendant owed no special duty
to the plaintiff or that the loss was the
result of governmental action taken in
response to the violation and/or negligence of
the defendant.

(c) Without limiting the generality of the
foregoing, persons engaged in commercial
fishing or shellfishing and/or the processors
of fish or shellfish, who can demonstrate that
they have sustained a loss of income or profit
as a result of damage to the environment
resulting from [violations of law or
negligence] . . . shall have a cause of action
for economic loss. Persons employed by, or
who operate businesses, who have sustained a
loss of income or profit as a result of a
decrease in the volume of business caused by
the damage to the environment shall also be

-8-

entitled to maintain an action for economic
loss.

R.I. Gen. Laws 46-12.3-4.

For the purposes of this appeal only, Ballard concedes

that the dealers would have a valid cause of action under

this statute, and that the Compensation Act, which became

effective on September 30, 1990, may be applied retroactively

to cover the 1989 M/V World Prodigy spill.2 We think that

the statutory claims effectively subsume state common law

claims since the Compensation Act appears to go as far and

further than common law in departing from Robins. Thus, we

focus upon the statute.

The shipowner and captain insist, and the district court

agreed, that the state claims are preempted under the

doctrine of Southern Pacific Co. v. Jensen, 244 U.S. 205

(1917). Jensen, in a now famous passage, held that state

legislation affecting maritime commerce is invalid "if it

contravenes the essential purpose expressed by an act of

Congress, or works material prejudice to the characteristic

features of the general maritime law, or interferes with the

proper harmony and uniformity of that law in its interna-

tional and interstate relations." Id. at 216.

2See 1990 R.I. Pub. Laws ch. 198, 2 (providing that

the Compensation Act shall apply to all causes of action
pending on or after September 30, 1990, regardless of when
the violation and/or act of negligence occurred, as long as
suit was commenced within the applicable statute of
limitations).

-9-

Jensen, however, was by its own terms something less

than a rule of automatic and mechanical preemption. "It

would be difficult, if not impossible," said the Court, "to

define with exactness just how far the general maritime law

may be changed, modified, or affected by state legislation.

That this may be done to some extent cannot be denied." 244

U.S. at 216 (emphasis added). What is even more telling is

that the Supreme Court after Jensen, without ever repudiating

its language, upheld the application of state law in a number

of maritime-related cases despite the existence of a direct

conflict between maritime rules and state law.

This saga is recounted in Professor Currie's classic

article, aptly titled "Federalism and the Admiralty: `The

Devil's Own Mess,'" 1960 Sup. Ct. Rev. 158. A familiar

example is Just v. Chambers, 312 U.S. 383 (1941), where the

Court permitted a state law claim for personal injury

occurring on board a ship against the estate of the vessel's

owner, despite a contrary maritime rule that a shipowner's

liability does not survive his death. This year, in American

Dredging Co. v. Miller, 114 S. Ct. 981 (1994), the Court

upheld a Louisiana open-forum statute, making the forum non

conveniens doctrine unavailable in savings clause cases, even

though forum non conveniens is a part of federal maritime

law.

American Dredging assertedly reaffirms Jensen's three-

-10-

prong test for preemption quoted above. Since no act of

Congress directly governs our case, the first prong

(contravention) is irrelevant to our case. The third prong

("proper harmony and uniformity") we reserve for

consideration below. What is of immediate concern is the

second ("material prejudice") prong; and here, American

Dredging gave the famous language a twist that could not

easily have been anticipated by the litigants in this case or

by the district court.

Judged by the bare language of Jensen, the Compensation

Act might easily seem to do "material prejudice" to a

"characteristic feature" of maritime law, since Robins is the

governing maritime rule and the Compensation Act rejects

Robins in everything but name. But the word "characteristic"

has different shadings, and American Dredging, in its first

and most important holding, gives the "characteristic

feature" language a definitive meaning: it reads the phrase

to apply--and apparently only to apply--to a federal rule

that either "originated in admiralty" or "has exclusive

application there." 114 S. Ct. at 987.

Indeed, Justice Scalia goes on to say that the doctrine

at issue in American Dredging, the doctrine of forum non

conveniens, "is and has been a doctrine of general

application" and that "therefore" its disregard by Louisiana

does not prejudice "[a} characteristic featur[e]" of general

-11-

maritime law." 114 S. Ct. at 987. Further, only so narrow a

reading of the characteristic feature test comports with the

result in American Dredging. Since the forum non conveniens

doctrine had long and widespread application in admiralty

cases, id. at 986, a broad reading of the characteristic

feature test would have resulted in preemption.

Although it is easier to identify the origins of a

doctrine recognizing liability than one denying it, we have

found no evidence that Robins' denial of recovery for purely

economic losses originated in admiralty. Justice Holmes's

opinion in Robins presents the rule as a virtual truism for

which "no authority need be cited," 275 U.S. at 309, and

refers the reader to three other opinions in which "[a] good

statement [of the rule] will be found." Id. (citing Elliot

Steam Tug Co., Ltd. v. The Shipping Controller, 1 K.B. 127,

139, 140 (1922); Byrd v. English, 117 Ga. 192, 43 S.E. 419

(1903); and The Federal No. 2, 21 F.2d 313 (2d Cir. 1927)).

Although Elliot Steam Tug and The Federal No. 2 are both

maritime cases, Byrd involved a suit against a defendant who

had negligently damaged the lines supplying power to

plaintiff's printing company. Justice Holmes also cited

another case, National Savings Bank v. Ward, 100 U.S. 195

(1879), which involved a suit by a plaintiff who had relied

upon a certificate of title prepared by the defendant

attorney for a third party.

-12-

The rule applied in Robins is also sometimes traced to

Cattle v. Stockton Waterworks Co., 10 Q.B. 453 (1875), which

concerned liability for delays suffered by plaintiff's

construction company caused by water leaking from defendant's

pipes. The admiralty cases thus reflect a traditional, if

not invariable, "general principle denying liability for

purely economic loss in the law of negligence." Atiyah,

"Negligence and Economic Loss," 83 L.Q. Rev. 248, 248-51

(1967). In sum, "Robins broke no new ground but instead

applied a principle, then settled both in the United States

and England, which refused recovery for negligent

interference with `contractual rights.'" Testbank, 752 F.2d

at 1022.

Nor has the doctrine forbidding recovery of such losses

had "exclusive" application in admiralty. State of Louisiana

ex rel. Guste v. M/V Testbank, 752 F.2nd 1019, 1022 (5th Cir.

1985) (en banc), cert. denied, 477 U.S. 903 (1986). Rather,

courts have denied liability for purely economic harm in a

variety of land-based contexts.3 Such cases rest on a

3See, e.g., Dundee Cement Co. v. Chemical Laboratories,

Inc., 712 F.2d 1166 (7th Cir. 1983) (denying recovery for

lost profits from owner of tanker truck which overturned,
blocking the only entrance to plaintiff's cement plant);
Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp., 345

N.W.2d 124 (Iowa 1984) (holding that businesses adversely
affected by closing of bridge in which cracks developed could
not recover for economic losses against the builder of the
bridge); Stevenson v. East Ohio Gas Co., 73 N.E.2d 200 (Ohio

Ct. App. 1946) (holding that plaintiff could not recover lost
wages against defendant, whose negligence in storing

-13-

concern about extending the scope of tort liability beyond

the generally limited class of individuals who suffer

physical damage to person or property. See Rabin, "Tort

Recovery for Negligently Inflicted Economic Loss: A

Reassessment," 37 Stan. L. Rev. 1513, 1528 (1985). This

concern stretches landward quite as much as seaward. Thus,

we hold that Rhode Island's decision to depart from Robins

does not materially prejudice a rule that originated in or is

exclusive to general maritime law.

Even absent prejudice to a characteristic feature of

admiralty, state legislation is preempted if (under Jensen's

third test) it "interferes with the proper harmony and

uniformity" of maritime law. Jensen, 244 U.S. at 216. As

Justice Scalia observed in considering this question, "[i]t

would be idle to pretend that the line separating permissible

from impermissible state regulation is readily discernible in

our admiralty jurisprudence, or indeed is even entirely

consistent within our admiralty jurisprudence." American

Dredging, 114 S. Ct. at 987. He did not, however, articulate

a definitive test of harmony and uniformity, holding only

that there is no preemption where the relevant state law is

procedural rather than substantive. Id. at 988. In our case,

the Rhode Island statute is indisputably substantive.

explosives caused destruction of plaintiff's nearby place of
employment); Hart Eng'g Co. v. FMC Corp., 593 F. Supp. 1471,

1481-84 (D.R.I. 1984) (Selya, J.).

-14-

Where substantive law is involved, we think that the

Supreme Court's past decisions yield no single, comprehensive

test as to where harmony is required and when uniformity must

be maintained. Rather, the decisions however couched reflect

a balancing of the state and federal interests in any given

case. See, e.g., Kossick v. United Fruit Co., 365 U.S. 731,

738-42 (1961); Huron Portland Cement Co. v. City of Detroit,

362 U.S. 440, 442-48 (1960). Our circuit has acknowledged

that "the Supreme Court . . . no longer construes the

Admiralty Clause as requiring `rigid national uniformity in

maritime legislation,'" Carey v. Bahama Cruise Lines, 864

F.2d 201, 207 (1st Cir. 1988), and that the preemption issue

"ordinarily requires a delicate accommodation of federal and

state interests." Id. As Professor Currie summed up the

matter:

The maritime nature of an occurrence does not
deprive a state of its legitimate concern over
matters affecting its residents or the conduct of
persons within its borders; but the federal
admiralty powers were granted to protect certain
federal interests in maritime and commercial
affairs. An issue created by such a conflict of
interests can be resolved only by reference to
those interests and by an attempt to maximize the
effectuation of the proper concerns of both state
and nation.

1960 Sup. Ct. Rev. at 169.

In balancing the state interest in regulation against a

potential overriding federal need for harmony or uniformity,

we start with Rhode Island's interest in implementing its

-15-

Compensation Act. No one can doubt that the state's interest

in avoiding pollution in its navigable waters and on its

shores, and in redressing injury to its citizens from such

pollution, is a weighty one. In Huron Portland Cement, the

Supreme Court described state air pollution laws as a classic

example of police power, and continued: "In the exercise of

that power, the states . . . may act, in many areas of

interstate commerce and maritime activities, concurrently

with the federal government." 342 U.S. at 442 (emphasis

added).

In Askew v. American Waterways Operators, Inc., 411 U.S.

325 (1973), the Court sustained, against a maritime-law

preemption challenge, a Florida statute that imposed no-fault

liability on vessel owners and operators for damages to

private parties caused by oil spills in territorial waters.

Justice Douglas described oil spillage as "an insidious form

of pollution of vast concern to every coastal city or port

and to all the estuaries on which the life of the ocean and

lives of the coastal people are greatly dependent." Id. at

328-29. See also id. at 332-43.

Claimants in this case argue flatly that Askew, without

more, sustains the Rhode Island statute; and perhaps it does.

The difficulty is that Justice Douglas rejected the maritime

law preemption claim on the ground that Jensen had nothing to

do with "shoreside injury by ships on navigable waters." 411

-16-

U.S. at 344. "Historically," said Justice Douglas, "damages

to the shore or to shore facilities were not cognizable in

admiralty." Id. at 240. Although Congress had by statute

extended admiralty jurisdiction shoreword in 1948, the Court

said that this extension did not carry Jensen with it. Id.

at 341.

If Justice Douglas meant to avoid preemption for

physical damage to the shore or shore facilities, as his

words seem to suggest, this might easily not embrace damage

to bay waters or the beds beneath them. If instead Askew

meant to allow a state remedy for any intangible impact or

loss ultimately felt on shore, it is hard to see what would

be left of preemptive federal authority since the most

traditional of admiralty events--for example, a ship

collision or a seaman's death-- has such intangible effects

ashore. However the riddle of Askew is solved, we think it

safest to take it here merely to show, as it assuredly does,

the importance of the state's interest in providing remedies

for vessel-caused oil pollution damage.

The federal interest in limiting remedies is more subtle

but also not without importance. The Compensation Act does

not regulate the out-of-court behavior of ships or sailors--

what is sometimes called "primary conduct"; rather the act is

concerned with the liability imposed for conduct that is

already unlawful. State regulation of primary conduct in the

-17-

maritime realm is not automatically forbidden, e.g., Ray v.

Atlantic Richfield Co., 435 U.S. 151, 179-80 (1978), but such

regulation presents the most direct risk of conflict between

federal and state commands, or of inconsistency between

various state regimes to which the same vessel may be

subject.4

Instead, the question here is the familiar one of

burden. At some point, a regime of liability, or a diversity

of regimes, could impose or threaten such heavy costs that

maritime commerce may itself be impaired. Initially such

costs are borne by shipowners but in the end they affect

every business that uses ships or receives raw materials by

ship and every citizen who, as a worker or consumer, depends

upon such commerce. A regime may also be so difficult to

administer as to prevent the efficient and predictable

resolution of maritime disputes. These are not trivial or

irrelevant concerns, for "the fundamental interest giving

rise to maritime jurisdiction is the protection of maritime

commerce."5

4O'Melveny & Myers v. Federal Deposit Ins. Corp., 114 S.

Ct. 2048, 2055 (1994) (suggesting that uniformity is most
important where the rule at issue is one governing primary
conduct); American Dredging, 114 S. Ct. at 988-89 (noting

that "forum non conveniens does not bear upon the substantive

right to recover, and is not a rule upon which maritime
actors rely in making decisions about primary conduct").

5Exxon Corp. v. Central Gulf Lines, Inc., 111 S. Ct.

2071, 2074 (1991) (internal quotations omitted). The Supreme
Court has regularly considered such burdens in admiralty

-18-

Indeed, these very concerns--with the burden of

liability and of administration--underpin the Robins rule

itself and are discussed at length in Barber Lines, 754 F.2d

at 54-55. But it is one thing to say that a federal court,

largely responsible for shaping the common law of admiralty,

should follow a longstanding liability rule to govern a

federal cause of action. It is quite another to say that a

state remedy, presumptively preserved under the savings to

suitors clause, is potentially so disruptive as to be

unconstitutional. Where as here the state remedy is aimed at

a matter of great and legitimate state concern, a court must

act with caution.

The question, then, is whether absent the Robins rule

there remain limitations on the scope of recovery under the

Compensation Act adequate to limit the burden it imposes on

maritime commerce. The Compensation Act has yet to be

construed by the Rhode Island courts. We nevertheless assume

that its extension of liability to cover all "loss of income

or diminution of profit . . . as a result of damage to the

preemption cases, see, e.g., Ray v. Atlantic Richfield Co.,

435 U.S. 151, 179-80 (1978); Huron Portland Cement, 362 U.S.

at 443-44, and has drawn explicit parallels between admiralty
preemption and Commerce Clause analysis. See Davis v.

Department of Labor and Industries of Washington, 317 U.S.

249, 257 (1942); Wilburn Boat Co. v. Fireman's Fund Ins. Co.,

348 U.S. 310, 323-24 (1955) (Frankfurter, J., concurring in
the result). This does not, however, mean that the admiralty
clause simply duplicates a commerce clause analysis. See

American Dredging, 114 S. Ct. at 988 n.3.

-19-

natural resources of the state of Rhode Island caused by the

violation of [Rhode Island pilotage or pollution laws]," R.I.

Gen. Laws 46-12.3-4 (emphasis supplied), incorporates the

familiar tort limitations of foreseeability and proximate

cause. These principles do in some measure limit the burden

imposed on maritime shipping.

Foreseeability may extend some distance, cf. Barber

Lines, 764 F.2d at 52, and "remoteness" is scarcely a sharply

defined concept. Compare Petitions of Kinsman Transit Co.,

388 F.2d 821 (2d Cir. 1968) (rejecting Robins but excluding

economic losses suffered by the owner of a vessel prevented

from unloading its cargo above a bridge that collapsed as a

result of defendant's negligence as too remote to permit

recovery). We cannot be sure how Rhode Island courts will

develop these concepts in the context of oil pollution cases.

Depending on Rhode Island's solutions, the burdens imposed by

the Compensation Act, financial and administrative, may be

substantial but they may also be tolerable. One might say

that the case for preemption at this stage is subject to the

Scotch verdict--not proven.

Having said all this, we think one final consideration

tips the scales in favor of the Compensation Act's validity.

Congress has recently enacted the Oil Pollution Act, 33

U.S.C. 2701 et seq., which almost certainly provides for

-20-

recovery of purely economic damages in oil spill cases.6

Section 2702(b)(2)(E) of the act provides that "[d]amages

equal to the loss of profits or impairment of earning

capacity due to the injury, destruction, or loss of real

property, personal property, or natural resources, . . .

shall be recoverable by any claimant." The House Conference

Report makes clear that, under section 2702(b)(2)(E), "[t]he

claimant need not be the owner of the damaged property or

resources to recover for lost profits or income". H.R. Conf.

Rep. No. 101-653, 101st Cong., 2d Sess. 103 (1990). The act

also expressly provides that it does not preempt state

imposition of additional liability requirements. 33 U.S.C.

2718(a).

The statute contains another substantial piece of

evidence that Congress means to allow recovery of economic

losses from injury to natural resources even though the

claimant's own property was not damaged. In another

subsection of the damage provision, there is an explicit

provision for recovery of "economic losses resulting from

destruction of real or personal property" by a claimant "who

6We say "almost" only because one court has held to the
contrary. See In re Petition of Cleveland Tankers, Inc., 791

F. Supp. 669, 678-79 (E.D. Mich. 1992). Most commentators,
by contrast, have read the new statute--as its language and
legislative history suggest--to override the Robins Dry Dock

rule, see McCurdy, "An Overview of OPA 1990 and Its

Relationship to Other Laws," 5 U.S.F. Mar. L.J. 423 (1993);
Gonynor, "The Robins Dry Dock Rule: Is the `Bright Line'

Fading?" 4 U.S.F. Mar. L.J. 85 (1992).

-21-

owns or leases that property." 33 U.S.C. 2707(b)(2)(B).

If the "natural resources" injury provision in subsection (E)

were limited to those owned by the claimant, the recovery

thus provided would be already covered by subsection (B) and

subsection (E) would be redundant. United States v. Ven-

Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) (readings

that create redundancies are not favored).

The new federal statute does not apply retroactively to

govern the present case. See Pub. L. No. 101-380, 1020

(providing that the statute "shall apply to an incident

occurring after the date the enactment of this Act [August

18, 1990]."). But we think that the statute is compelling

evidence that Congress does not view either expansion of

liability to cover purely economic losses or enactment of

comparable state oil pollution regimes as an excessive burden

on maritime commerce. Given the Congress' superior ability

to weigh the very practical considerations relating to such a

judgment, we give Congress' conclusion substantial weight.

For this purpose, the non-retroactivity of the statute is

irrelevant.

We hold, then, that the Rhode Island's Compensation Act

as reasonably construed and applied is not preempted by the

admiralty clause of the Constitution. We express no judgment

on whether claimants' particular injuries were reasonably

foreseeable or proximately caused by the grounding of the M/V

-22-

World Prodigy, or whether claimants' claims are otherwise

viable under the Rhode Island statute. That determination is

for the district court in the first instance or for the state

courts. Robins Dry Dock remains the rule in this circuit for

federal claims; we simply hold that Rhode Island is free to

chart a different course.

Because of the Oil Pollution Act, it may well be that

the immediate problem with which we have wrestled at length

in this case is a transient one; the legal regime for oil

pollution accidents after August 18, 1990, will largely be a

creature of the new statute. But the case before us, like

all cases, is important to the litigants, and the governing

legal standards have application elsewhere. Applying an

imprecise federal preemption standard to a little construed

state statute is no easy task. For the present, assuming

that the Rhode Island statute is providently construed and

applied, we think that it is not unconstitutional.

The decision of the district court dismissing

plaintiffs' federal claims is affirmed; the dismissal of

plaintiffs' state claims is reversed and the case is remanded

for further proceedings consistent with this opinion.

-23-