John R. NULLE and Jeanne B. Nulle, as Parents, Next Friends, Guardians, and Co–Conservators of Kathryn Dawn Nulle, Appellants (Plaintiffs),

v.

**GILLETTE–CAMPBELL COUNTY JOINT POWERS FIRE BOARD,** Appellee (Defendant).

No. 89–251.

Supreme Court of Wyoming.

Sept. 14, 1990.

Michael A. Maycock of Michael A. Maycock, P.C.; and S. Gregory Thomas of Banks, Johnson & Wolfe, Gillette, for appellants.

Paul J. Drew, Gillette, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

Kathryn Dawn Nulle, by her natural parents, appeals from the trial court's dismissal of her claim for loss of parental consortium arising from her natural father's personal injury at the allegedly negligent hands of the Gillette–Campbell County Joint Powers Fire Board (Board).

Both parties agree that the sole question we must answer is whether under Wyoming law a child has a legally cognizable claim for loss of parental consortium against a third-party who negligently injures that child's parent. We hold that Wyoming recognizes the child's claim, reverse the trial court's dismissal of the complaint, and remand for further proceedings consistent with this opinion.

## FACTS

According to the complaint filed on behalf of Kathryn Dawn Nulle (Kathryn), she was seven years and three months old on July 27, 1987, when her natural father, John R. Nulle, an employee of Fire Fighters Equipment Company, Inc., was seriously injured by an explosion. The incident occurred when he was filling a tank with compressed air at the fire department operated by the Board in Gillette, Wyoming. Alleging the Board's negligence to have been the proximate cause of her father's injuries, Kathryn claimed she has sustained damages as a result of the injuries to her father, including the loss of her father's care, comfort and society.

The Board filed its motion to dismiss the complaint for failure to state a claim upon which relief can be granted. The trial court held a hearing on that motion and issued its order dismissing the complaint pursuant to W.R.C.P. 12(b)(6). This appeal followed.

## STANDARD OF REVIEW

In reviewing a trial court's dismissal of a claim under W.R.C.P. 12(b)(6), we accept the facts alleged in the complaint as true and view them in the light most favorable toward the party opposing the motion below. *Cooney v. Park County,* 792 P.2d 1287, 1290 (Wyo.1990). Here, Kathryn's complaint has satisfied the requirement that she plead only the operative facts giv-

ing rise to her claim in order to give fair notice to the Board. As recognized by the trial court and by the parties in their presentations below and here, the simple question is whether those operative facts constitute a legally cognizable claim in this state.

## ANALYSIS

In support of its position urging this court to affirm the trial court's dismissal of the complaint, the Board relies upon the common law view, held by a majority of jurisdictions having decided the question whether a child's parental consortium claim is legally cognizable.[1] The Board contends that some seven traditional arguments culled from the opinions of the courts that have decided this question present a compelling case for rejecting this claim in Wyoming. Those arguments are: lack of precedent, lack of the child's legal entitlement, multiplicity of suits, difficulty of assessing damages, double recovery, exposure to exorbitant liability, and increased insurance costs. Additionally, the Board notes that Kathryn's claim is not joined with her father's direct personal injury claim and her mother's spousal consortium claim and alleges no economic or special damages.

Kathryn challenges traditional argument by advocating a minority viewpoint that recognizes a child's claim to parental consortium. In addition to meeting the traditional opposing arguments, Kathryn finds major support for her position in Wyoming's wrongful death statute that allows the deceased's survivors, including spouse and children, to recover for loss of probable future companionship, society and comfort. W.S. 1–38–102(c) (Cum.Supp.1987). She points to society's increasing recognition of children's rights, to Wyoming's legislative protection of children in the areas of domestic relations, education, criminal law, labor and employment. She also points to this court's recognition of a wife's claim for loss of her injured husband's consortium. *Weaver v. Mitchell*, 715 P.2d 1361 (Wyo. 1986). We note considerable commentary on this subject.[2]

Since the Board urges us to reject the child's claim based on the common law view, we begin our analysis by identifying our common law jurisprudential understanding. In an unwavering line of decisions over the last fifty years, this court has emphasized that

> [A]lthough W.S. 8–1–101 adopts the common law as the law of this state, we have held that we will recognize the common law as modified by judicial decisions and will adopt that interpretation which seems best. *Krug v. Reissig*, 488 P.2d 150, 152 (Wyo.1971); *In re Smith's Estate*, 55 Wyo. 181, 97 P.2d 677, 681 (1940). Moreover, we have previously expressed a reluctance to recognize, or continue a recognition of, a common law rule that had its genesis in a social, economic and political climate entirely foreign to Wyoming in current times. *Weaver v. Mitchell*, 715 P.2d 1361, 1369 (Wyo.1986).

*Champion Well Service, Inc. v. NL Industries*, 769 P.2d 382, 383 (Wyo.1989). In *Champion* we concluded that, under current social circumstances, the common law rule that permitted an employer's recovery for the loss of an injured employee's services from a negligent third party is "neither well suited to the times nor accepted in modern jurisprudence." *Id.*

---

1. *See Dearborn Fabricating & Engineering Corp., Inc. v. Wickham*, 532 N.E.2d 16 n. 2 (Ind.App.3 Dist.1988) and *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 992 n. 4 (Alaska 1987), for a list of jurisdictions rejecting the claim. *See also* Restatement (Second) of Torts § 707A (1977); and Annotation, *Child's Right of Action for Loss of Support, Training, Parental Attention, or the Like, Against a Third Person Negligently Injuring Parent*, 11 A.L.R.4th 549 (1982).

2. Pound, *Individual Interests in the Domestic Relations*, 14 Mich.L.Rev. 177, 185–86 (1916); Love, *Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship*, 51 Ind.L.J. 590 (1976); Note, *The Child's Right to Sue for Loss of a Parent's Love, Care and Companionship Caused by Tortious Injury to the Parent*, 56 B.U. L.Rev. 722 (1976); Cooney and Conway, *The Child's Right to Parental Consortium*, 14 J. Marshall L.Rev. 341 (1981); and Note, *Torts—Child May Recover for Loss of Parent's Society and Companionship*, 68 Marq.L.Rev. 174–88 (1984).

The decision in *Champion* is consistent with this court's analysis in *Gates v. Richardson*, 719 P.2d 193 (Wyo.1986) and *Weaver*. In *Weaver*, this court rejected the common law rule that a wife could not recover damages for the loss of consortium following the negligent injury of her husband:

> We have not hesitated to overrule cases that were based on what was perceived to be the common law at the time the decisions were handed down. *McClellan v. Tottenhoff*, 666 P.2d 408 (Wyo.1983); and *Collins v. Memorial Hospital of Sheridan County*, 521 P.2d 1339 (Wyo.1974). We are justified in overruling prior cases grounded on the common law if they stand for an unfair and improper rule or have outlived their usefulness, and do not meet changing needs.

*Weaver*, 715 P.2d at 1368. In *Gates* this court rejected the common law rule denying a family member recovery of damages for the negligent infliction of emotional distress. The gradual elimination of outmoded principles becomes evident from these cases.

These decisions reflect Oliver Wendell Holmes' view of the development of the common law:

> The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellowmen, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become. We must alternately consult history and existing theories of legislation. But the most difficult labor will be to understand the combination of the two into new products at every stage.

O.W. Holmes, *The Common Law* 1 (1881).

With this understanding of the common law's dynamism, we continue our analysis by next considering the nature of the parent-child relationship in today's society. This court has observed that this relationship is "the earliest and most hallowed of the ties that bind humanity * * *." *Matter of Adoption of Voss*, 550 P.2d 481, 485 (Wyo.1976). In 1982, this court expressed the current belief, contrary to the thinking prevailing in Dickensian England, that "a child should not be viewed as piece of property. * * *." *Beardsley v. Wierdsma*, 650 P.2d 288, 293 (Wyo.1982). Perhaps the most telling recognition by this court of the nature of the parent-child relationship is found in this court's forcefully stated view that:

> The right to associate with one's immediate family is a fundamental liberty protected by the state and federal constitutions. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (integrity of the family unit protected by the due-process clause of the Fourteenth Amendment); and *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (implication that liberties guaranteed by the federal constitution are fundamental) * * *. Analysis of the Wyoming Constitution and case law also leads to the conclusion that the right to associate with one's family is a fundamental liberty. Article 1, Sections 2, 6, 7 and 36, Wyoming Constitution; *Washakie County School District Number One v. Herschler*, Wyo. 606 P.2d 310 (1980); *Matter of Adoption of Voss*, Wyo., 550 P.2d 481 (1976); and *In re Adoption of Strauser*, 65 Wyo. 98, 196 P.2d 862 (1948).

*DS v. Department of Public Assistance and Social Services*, 607 P.2d 911, 918 (Wyo.1980). *Accord, TR v. Washakie County Department of Public Assistance*, 736 P.2d 712, 715 (Wyo.1987); *Matter of MLM*, 682 P.2d 982, 990 (Wyo.1984); *Matter of GP*, 679 P.2d 976, 981–82 (Wyo.1984).

The United States Supreme Court has emphasized: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944).[3]

Having examined the nature of the parent-child relationship at length, we note that most courts that have rejected the child's parental consortium claims have conceded the reality of the loss suffered when the socially important parent-child relationship is damaged because of the negligence of a third party directly injuring a parent. For example, in *Hoffman v. Dautel*, 189 Kan. 165, 168, 368 P.2d 57, 59 (1962), the court said:

> It is common knowledge that a parent who suffers serious physical or mental injury is unable to give his minor children the parental care, training, love and companionship in the same degree as he

might have but for the injury. Hence, it is difficult for the court, on the basis of natural justice, to reach the conclusion that this type of action will not lie. Human tendencies and sympathies suggest otherwise. Normal home life for a child consists of complex incidences in which the sums constitute a nurturing environment. When the vitally important parent-child relationship is impaired and the child loses the love, guidance and close companionship of a parent, the child is deprived of something that is indeed valuable and precious. No one could seriously contend otherwise.

We agree. It is clear that a child suffers substantive injury when a parent is negligently injured and is unable to perform parental functions. Cooney & Conway, *supra*, at 351.

We now briefly address the traditional arguments distilled from the decisions of those courts that have either rejected or recognized the child's parental consortium claims. The Board contends those argu-

---

**3.** Margaret Mead tells us

> [t]he family is * * * the institution * * * to which we owe our humanity. [W]e know no other way to bring children up to be human beings, able to act like men and women, and able to marry other men and women, and bring up children, except through the family.

M. Mead, "The Impact of Cultural Changes on the Family," *The Family in the Urban Community*, Detroit: The Merrill–Palmer School 4 (1953) (quoted in G.R. Leslie, *The Family in Social Context* 3 (1967)). Leslie further informs us that, "The family is the very cradle of human nature. Family experience is necessary to turn a newborn infant * * * into a fully human being with values and standards and the ability to live harmoniously with other people." Leslie, *supra*, at 3.

Another commentator on family relations teaches:

> The intense emotional meaning of family relations for almost all members of a society has been observable throughout man's history. Philosophers and social analysts have noted that society is a structure made up of *families*, and that the peculiarities of a given society can be described by outlining its family relations. The earliest moral and ethical writings suggest that a society loses its strength if people fail in their family obligations.
>
>     *   *   *   *   *   *
>
> The strategic significance of the family is to be found in its *mediating* function in the larger society. It links the *individual* to the larger

social structure. A society will not survive unless its many needs are met, such as the production and distribution of food, protection of the young and old, the sick and the pregnant, conformity to the law, the socialization of the young, and so on. The formal agencies of social control (such as the police) are not enough to do more than force the extreme deviant to conform. Socialization makes most of us wish to conform, but *throughout each day we are often tempted to deviate*. Thus both the internal controls and the formal authorities are insufficient. What is needed is a set of social forces that responds to the individual whenever he does well or poorly, supporting his internal controls as well as the controls of the formal agencies. The family, by surrounding the individual through much of his social life, can furnish that set of forces.

>     *   *   *   *   *

Thus it is *through the family* that the society is able to elicit from the *individual* his necessary contribution. The family, in turn, can continue to exist only if it is supported by the larger society.

W.J. Goode, *The Family*, 1–3 (1964). As an instrument of the larger society, Goode says, the family's "failure to perform adequately means that the goals of the larger society may not be attained effectively." *Id.*, at 5.

ments weigh in its favor; Kathryn asserts they weigh in her favor. We find the analysis of those decisions which have recognized the child's claim more persuasive than the analysis of those decisions which have rejected the claim. In addressing traditional arguments we have kept in mind this court's common law heritage and the nature of the "parent-child relational interest" at risk, the loss suffered when that relational interest is damaged by a third party's negligence, the fundamental role of socialization played by the family unit in our society, and the fundamental liberty interest in family association.

The first traditional argument is that the claim is unsupported by precedent. More courts have rejected the claim than have recognized it, but the decisions of the last decade show movement toward recognition in other jurisdictions; legal commentators advocate recognition. *Hibpshman*, 734 P.2d at 992 nn. 5, 6. This court has not hesitated to break new ground and adopt an interpretation that meets the changing needs of this state's citizens when a common law rule has outlived its usefulness or is incompatible with social policy. Such need for change was evidenced in *Gates* (recognition of the claim of negligent infliction of emotional distress) and in *Weaver* (recognition of the wife's claim for loss of consortium).

The second argument on which the Board relies is the lack of the child's legal entitlement. We find that argument meritless. In the wrongful death statute, the Wyoming legislature has expressed a social policy that favors compensation to ameliorate the certain damage to relational interests resulting from the death of a family member. Under that statute a child has a legally cognizable claim for the permanent loss of a deceased parent's consortium. That statutorily recognized legal entitlement is compelling precedent upon which to base the child's legal entitlement to consortium damages in the case of a parent's serious injury. With a parent's death, the loss of consortium is permanent. With a parent's serious injury, the loss of consortium may be either temporary or permanent depending on the nature and extent of the injury. We trust the factfinder to sort that out according to the evidence. As we have also shown, the child's legal entitlement is based upon his or her fundamental liberty interest in familial association with his or her parent.

The Board further challenges the existence of the child's legal entitlement by appropriately pointing out that in *Gates* this court refused to recognize a parent's claim for loss of an injured child's consortium. *Gates*, 719 P.2d at 201. Admittedly, that comparison has a certain surface appeal. On closer examination, however, that comparison is readily distinguished. In our society the minor child requires his or her parent's nurturing, guidance, and supervision. The child is uniquely dependent upon the parent for his or her socialization, that maturation process which turns a helpless infant into an independent, productive, responsible human being who has an opportunity to be a valuable, contributing member of our society. Without question, the child's relational interest with the parent is characterized by dependence. In contrast, the. parent's relational interest with the child is not. In a real sense, the child is "becoming" and the parent "has become." Thus, the parent's loss of an injured child's consortium is different in kind from the child's loss of an injured parent's consortium. Viewed in this light, our refusal in *Gates* to recognize the parent's claim is inapposite to the legal problem whether we recognize the child's claim.

The third argument advanced by the Board is that recognition of the claim will foster a multiplicity of suits which have not been filed contemporaneously. Here, for example, Kathryn's claim was filed at a time when her parents had not yet filed theirs; however, she faced a statute of limitations problem.[4] In *Gates* this court

---

**4.** Kathryn's father was injured on July 27, 1987, when she was seven years old. Under W.S. 1–39–114 (Cum.Supp.1987), she had to file an action by July 27, 1989. In contrast, her father had two years to file his claim under W.S. 1–39–113(a) (Cum.Supp.1987), and then had an additional year under W.S. 1–39–114 in which to file his action.

answered a similar argument, saying that suits for emotional injury limited to those arising from severe physical injury to another will most often be joined with the underlying actions based on the primary victim's physical injury. *Gates,* 719 P.2d at 197. In *Hibpshman,* the Alaska Supreme Court found the practical and fair solution to the problem to be a requirement that the child's claim be joined with the injured parent's claim whenever feasible. *Hibpshman,* 734 P.2d at 997.

The Board next expresses concern about the difficulty of assessing damages, the danger of double recovery, and the tortfeasor's exposure to exorbitant liability. Even those courts that reject the child's claim recognize the real damage to the "parent-child relational interest" occasioned by serious injury to the parent. In Wyoming there is a "general policy in favor of imposing the loss on the negligent tortfeasor rather than the innocent victim * * *." *Gates,* 719 P.2d at 198. Just because difficulty attends assessment of damages is no reason to deny damages altogether. A factfinder's calculation of damages for a child's loss of parental consortium is not any more difficult than that calculation necessary in other actions involving spousal consortium, wrongful death consortium, emotional distress whether inflicted negligently or intentionally, pain and suffering, or loss of enjoyment of life. The specter of double recovery can be easily eliminated by the trial court's distinctly specifying in proper jury instructions the respective elements of damages to which the parent and the child are each entitled. We presume the jury reads and follows its instructions. *City of Cheyenne v. Simpson,* 787 P.2d 580, 582 (Wyo.1990).

Finally, the Board warns that this court's recognition of the child's claim will inevitably lead to increased insurance costs. In *Gates* this court rejected insurance costs arguments as a basis for denying recovery. Insurance is a loss-spreading device by design. Increases in premiums are unwarranted only when it is decided that the innocent victim will bear the loss rather than the guilty tortfeasor, his insurer, and the public. *See Gates,* 719 P.2d at 197.

This court agrees with Oregon's high court (denying recognition on other grounds):

> A person's liability in our law still remains the same whether or not he has liability insurance; properly, the provision and cost of such insurance varies with potential liability under the law, not the law with the cost of insurance.

*Norwest, By and Through Crain v. Presbyterian Intercommunity Hospital,* 293 Or. 543, 652 P.2d 318, 323 (1982). *See also Gates,* 719 P.2d at 206 (Rooney, J., concurring in part and dissenting in part).

We hold that minor children have an independent claim for loss of parental consortium resulting from injuries tortiously inflicted on their parent by a third person. We further hold that this independent claim should be joined with the injured parent's claim whenever feasible.

Accordingly, the trial court's dismissal of Kathryn's independent claim for loss of her father's consortium is reversed and the case is remanded for further proceedings consistent with this opinion.

THOMAS, Justice, dissenting.

I must dissent from the decision of the majority in this case. In *Gates v. Richardson,* 719 P.2d 193, 201 (Wyo.1986), we said:

> "Johnny's [Gates] mother, Peggy Merryman, and his natural father, Stewart Gates, filed claims for loss of filial companionship, alleging that Richardson's negligence deprived them of the comfort and companionship of their son. Most courts hold that a parent cannot recover for the loss of a child's companionship, and we agree. See 67A C.J.S. Parent and Child § 152; Annot., 69 A.L.R.3d 553. The district court's dismissal of the claims for loss of filial companionship is affirmed."

Most courts hold that a child cannot recover for the loss of parental consortium but, on this question, the majority of this court disagrees with the view of most courts.

I am convinced that filial consortium and parental consortium are opposite sides of the same coin, and loss of either should be treated identically to loss of the other. The

precedential policy was articulated in *Gates* and should be faithfully pursued, or *Gates* should be overruled. If the policy found in *Gates* is not acceptable to Wyoming citizens, then wisdom, in my opinion, would justify deference to the legislative department to adjust the rights of citizens as it has done in adopting and amending the wrongful death statute. Sections 1–38–101 to –102, W.S.1977 (June 1988 Repl.). While the logic articulated in the majority opinion appears impressive, the rationale is a familiar one in such cases. I am troubled, however, because it does not account for the entire spectrum of parent-child relationships such as the child who is not a minor yet still dependent.

I find that most of my concerns have been aptly captured by the United States Court of Appeals for the Third Circuit:

"Courts favoring the new claim stress the similarity to spousal consortium, the inconsistency of recognizing loss of services of a deceased parent under wrongful death statutes but not permitting recovery when an injured parent survives, and an assumed need to compensate for an acknowledged loss to the children. "Those courts brush aside such countervailing considerations as increased litigation and insurance costs, finding them speculative and insufficient to prevent creation of a new cause of action. They also point out that courts presently award monetary damages for such intangibles as emotional distress as well as pain and suffering. Declining to await legislative action, the courts that have adopted the new theory of recovery have relied on their duty, as they perceive it, to mold the common law to meet society's needs.

"The courts refusing to recognize the children's claims question the advisability of equating parental society with a monetary value. In addition, they point to the difficulties inherent in defining the limits of the new right (*e.g.*, whether it would apply only to minor children, whether it would extend to those standing *in loco parentis*), and note the probable increased insurance costs and added burden on the courts. A number of the courts also believe that this issue, essentially one of policy, should be resolved by the legislature.

"There is room to question the desirability of a court's decision to create a new cause of action without adequate demonstration of both need and cost. Curiously, with respect to increased costs of administering the claims, both the courts which dismiss that factor as insubstantial, as well as those which use it as an argument against recognition of a new cause of action, do so without any empirical data or statistical projections. In a concurring opinion, one judge has acknowledged that legislatures possess superior resources with which to weigh all potentially affected interests, *Norwest v. Presbyterian Intercommunity Hospital*, 293 Or. 543, 652 P.2d 318, 333 [(1982)] (Tanzer, J. concurring)." *DeLoach v. Companhia de Navegacao Lloyd Brasileiro*, 782 F.2d 438, 441 (3rd Cir.1986).

In the course of its opinion, the United States Court of Appeals for the Third Circuit noted that, at the time, five jurisdictions, following the lead of Massachusetts in *Ferriter v. Daniel O'Connell's Sons, Inc.*, 413 N.E.2d 690 (Mass.1980), had allowed recovery for claims such as this. It also noted that eight jurisdictions, "among others (footnote omitted), continue to deny recovery, adhering to the rule previously announced by the courts in some twenty states." *DeLoach*, 782 F.2d at 440.

Since 1986, Alaska, in *Hibpshman v. Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987), and Arizona, in *Villareal v. State Department of Transportation*, 774 P.2d 213 (Ariz.1989), have recognized such a claim. *Hibpshman*, 734 P.2d at 992, incorporates lists of those jurisdictions that have addressed the question, pro and con. In addition, the attempted recognition of the claim by the United State District Court for the District of Colorado, *Reighley v. International Playtex, Inc.*, 604 F.Supp. 1078 (D.Colo.1985), has been nullified by *Lee v. Colorado Department of Health*, 718 P.2d 221 (Colo.1986). A Court of Appeals in Indiana, in *Dearborn Fabri-*

*cating & Engineering Corporation, Inc. v. Wickham,* 532 N.E.2d 16 (Ind.App.3 Dist., 1988), also recognized this claim, but the Supreme Court of Indiana, upon review, reversed the Court of Appeals holding that "a child may not maintain an action for loss of parental consortium when the parent is negligently injured by a third person." *Dearborn Fabricating & Engineering Corporation, Inc. v. Wickham,* 551 N.E.2d 1135, 1139 (Ind.1990). Maryland and North Carolina also aligned themselves with the majority in 1989. *Gaver v. Harrant,* 316 Md. 17, 557 A.2d 210 (1989); *Vaughn v. Clarkson,* 324 N.C. 108, 376 S.E.2d 236 (1989). In both Connecticut and Tennessee, intermediate appellate courts have adopted the majority rule. *Mahoney v. Lensink,* 17 Conn.App. 130, 550 A.2d 1088 (1988); *Still by Erlandson v. Baptist Hospital, Inc.,* 755 S.W.2d 807 (Tenn.App. 1988). The count of jurisdictions is perhaps somewhat imperfect when traced through those opinions that have made the attempt, but it is clear that, for every jurisdiction that has recognized this claim, three have rejected it.

Those courts that have recognized claims like the one in the instant case have, as has the majority in this case, noted the fascination of academia with this topic. In my judgment, those who actually occupy the role of rule and policy making in society need to be most cautious about delegating that function to those who do not serve in that capacity and who, in fact, serve an entirely different function. It appears, in this instance, that a claim of a growing trend toward the recognition of a claim for filial consortium since 1980 is at least an exaggeration, if not a myth.

In the exercise of judicial restraint, and in the interest of certainty in the law, I would follow the view of the majority of jurisdictions, the authority for which is aptly noted in the opinion of the majority of this court, until our legislature articulates a different policy. Consistency with our decision in *Gates* demands that we reject the arguments and contentions of the Appellants.

I would affirm the trial court.